# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)* | )<br>)<br>)<br>)<br>)<br>) |

Case No.

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

❑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| | |

The application is based on these facts:

❑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ *(specify reliable electronic means).*

Date: _____

_____
*Judge's signature*

City and state: _____

_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ❏ Original          ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
_____ District of _____

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )          Case No.
)
)
)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.   ❏ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*   ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____          _____
*Judge's signature*

City and state: _____          _____
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:  _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 10 DIGITAL DEVICES, CURRENTLY LOCATED AT 1400 NEW YORK AVE. NW, WASHINGTON, DC 20543 UNDER RULE 41 | SW No. _____ |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, PHILLIP W. ALHUSEN, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – 10 Digital Devices – all of which are currently at the Child Exploitation and Obscenity Section of the Department of Justice (CEOS), in the, at High Tech Investigative Unit (HTIU) (the "SUBJECT DEVICES"), as described in Attachment A, and the extraction from that property of electronically stored information as described in Attachment B.

2. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) assigned to the Richmond, Virginia (VA), Field Office, Charlottesville Resident Agency and have been a Special Agent since 2002. As part of my duties as an FBI SA, I investigate criminal violations relating to child exploitation, in violation of 18 U.S.C. §§ 2422, 2423(a), and 2423(b), and child pornography including violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252 and 2252A. I have received training in the area of child pornography and child exploitation, and have had the opportunity to observe and review numerous examples of child pornography (as

defined in 18 U.S.C. § 2256) in all forms of media including digital media.  I have also received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer crimes, computer evidence identification, child pornography identification, computer evidence seizure and processing, and various other criminal laws and procedures.  I have personally participated in the execution of, and have been the affiant for, numerous search warrants involving the search and seizure of computer equipment, electronic items, and digital media.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      This affidavit is submitted in support of an application for a search warrant for various electronic items seized by the United States Probation Office (USPO) in the Western District of Virginia during a search of the residence of Ian Zearley at 401 East 2nd Street, Mineral, Virginia 23117, and the computer equipment, electronic item(s), and/or digital media located therein, for evidence of violations of 18 U.S.C. §§ 2422, 2252, and 2252A.  The electronic items seized by the USPO are more fully described in Attachment A.  The purpose of this application is to search for evidence of violations of 18 U.S.C. §§ 2422, 2252, and 2252A, (Enticement of a Minor, and Possession, Distribution, Receipt, and Access with Intent to View Child Pornography).  The items to be searched for are described more particularly below and in Attachment B.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5.      The property to be searched is as follows:

a)  One black HP laptop, Model # 17-bs049dx, SN 8CG80347OS;

b)  One Samsung Verizon Tablet, Model # SM-T387V, IMEI 355420101760479;

c)  One black Samsung Galaxy J7 Verizon cell phone, Model # SM-J727V, IMEI 359500095684714;

d)  One black/gray LG AT&T cell phone;

e)  One black ZTE cell phone with cracked screen and missing back cover;

f)  One black and red Kyocera DuraXV Verizon cell phone;

g)  Thumb drive/ red/silver/ Clatterbuck Home Inspections, LLC 571-337-2745;

h)  Thumb drive/ Lexar 16G/ White/Purple Top/ LJD 550-16GB-000-113;

i)  Thumb drive/ blue/silver/ Regional Plan Association/ 1 GB;

j)  Thumb drive/ Lexar/ white/ 16GB/ grey top/ LJD 550-16GB-000-109.

that is, the SUBJECT DEVICES.

6.      The SUBJECT DEVICES are currently located at HTIU, located at 1400 New York Ave. NW, Ste. 600 Washington, DC 20543.

## PROBABLE CAUSE

7.      On February 22, 2010, Ian Zearley appeared before The Honorable Norman K. Moon, Senior United States District Judge for the Western District of Virginia, after pleading guilty to Count One: Receive or Distribute Child Pornography, in violation of 18 U.S.C. §

3

2252(a)(2), and Count Two: Possess Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(b). The district court sentenced Zearley to a term of 76 months imprisonment as to each of Counts One and Two to run concurrently followed by a 20-year term of supervised release.  On June 8, 2015, Zearley began his term of supervised release in the Western District of Virginia.

8.      In addition to the mandatory and standard conditions of supervision, the Court imposed special conditions of supervision as well concerning the use and access of child pornography.  Regarding searches of his devices, Zearley was subject to the following condition: "Defendant shall submit to warrantless search and seizure of person and property as directed by the probation officer, to determine whether the defendant is in possession of firearms, child pornography, and controlled substances."

9.      Those Conditions of Supervision also stated:

The defendant must submit to a search of the defendant's person, property, house, residence, vehicle, papers, computer, and other electronic communication or data storage devices or media at any time, with or without a warrant, by any law enforcement or probation officer (in the lawful discharge of the probation officer's supervision functions) with reasonable suspicion concerning unlawful conduct or a violation of a condition of probation or supervised release. . . . The defendant must warn any other residents or occupants that their premises or vehicles may be subject to search pursuant to this condition.

10.     On June 22, 2015, the district court amended Zearley's conditions to include the following:

The defendant shall submit to a search of his or her person, property, residence, vehicle, papers, computer, electronic communication devices, or data storage devices or media at any time by the probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of release. The defendant should warn any other residents or occupants that their premises or vehicles in which the defendant may be located could be subject to search pursuant to this condition.

4

. . . .

The defendant shall permit the probation officer to conduct periodic, unannounced examinations of any computer equipment the defendant uses or possesses, which includes all hardware and software related to online use. This computer equipment includes but is not limited to any internal or external peripherals, internet-capable devices, and data storage media. These examinations may include retrieval and copying of data related to online use and viewing of pictures and movies which may be potential violations of the terms of supervision. The relevant computer equipment may be removed by the probation officer for more thorough examination. The probation officer may use and install any hardware or software system that is needed to monitor the defendant's computer use.

11.     On September 13, 2018, the district court amended Zearley's conditions of release, to include the following:

The defendant shall submit to search and seizure of his or her computer, as defined in 18 U.S.C. § 1030(e)(1), electronic communication devices, data storage devices, or other Internet-capable devices.  This may include the retrieval and copying of all data.  The defendant should warn any other residents or occupants that the premises or vehicles in which the defendant may be located could be subject to search pursuant to this condition.

12.     The USPO utilizes RemoteCom Computer Monitoring Service to monitor Zearley's computer usage.

13.     Because of these conditions of release, Zearley's devices were subject to examination.  While CEOS might already have all necessary authority to examine the SUBJECT DEVICES, I seek this additional warrant out of an abundance of caution to be certain that an examination of the SUBJECT DEVICES will comply with the Fourth Amendment and other applicable laws.

14.     On April 3, 2019, a probation officer made contact with Zearley at his residence. During this contact, Zearley and the probation officer discussed his triggers and coping skills.

5

During this conversation Zearley indicated he continues to have sexual thoughts about younger male children and believes he will never change.

15.     On May 24, 2019, the probation officer made contact at Zearley's residence. During this contact Zearley informed the probation officer his friend James Bourn would be living with him.

16.     On June 11, 2019, Zearley contacted the probation officer reporting the probation officer had mistakenly called him.  The probation officer informed Zearley no calls had been made to him. Zearley insisted he had a missed call from the probation officer. He inquired when the probation officer would be back at his residence because he wanted to make sure he was home at that time. The probation officer advised Zearley she didn't know when another contact would be made.

17.     On June 12, 2019, the probation office was informed by RemoteCom Computer Monitoring Service that there was possible inappropriate internet usage on Zearley's internet devices.  RemoteCom data revealed Zearley was searching for "real hardcore child porn," "boys severely whipped and bleeding," "images of little boys getting raped up their butts," "ball gags for kids," "butt plugs for kids," and also searched for a potty-training restraint seat. Additionally, his searches were related to children being anally raped and the data revealed he was using children's chat rooms.  Based on this information, the USPO conducted a search of Zearley's residence as authorized by his release terms.

18.     On the evening of June 12, 2019, the USPO, with the assistance of the United States Marshals Service and Louisa County Sheriff's Office, searched Zearley's residence.  The search included his home, a large detached storage building, and his truck.  Zearley's residence

was extremely dirty, his room was littered with used condoms, and soiled diapers were in his bathroom trash.  During the initial contact with Zearley, he stated, on numerous occasions, that he would "shoot probation officers if they stepped foot on his property again."

19.     The USPO seized several items, including the following:

a.   a box of business cards for a purported pedophilia organization, on which he was identified as the president;

b.   two handwritten journals with handwritten stories describing the sexual abuse of minors, which included, in part, the following statements: "Dad did him up the butt when he was 5 years old.  He tied him up. It really hurt a lot. He pooped too, right on dads 12 inch cock.  Ouchie big time";

c.   a list of names and their ages on a separate piece of paper: "Max – 7 – Friend, Brendon – 8 Friend, Cody – 8 – Friend,  Pasha – 7 – Friend, Casey – 10 – Friend, Alex – 7 – Friend, Luke – 8 Friend";

d.   handcuffs, and

e.   a 36-inch orange yardstick with  names written on it; on the yardstick, at the three inch line states  "Me/Conner/Aidian" and on the twelve inch line states "Daddy's Cock".

20.     The search yielded multiple unauthorized internet-capable devices that had not been reported or approved by the probation officer, including the SUBJECT DEVICES, described in Attachment A.   The HP Laptop and Kyocera DuraXV cell phone were found in Zearley's living room; the Samsung tablet, thumb drives, and LG AT&T cell phone were found

in a storage building; the Samsung Galaxy cell phone was found in Zearley's truck; and the ZTE cell phone was found in Zearley's bedroom.

21.     At the search, the USPO interviewed Zearley's roommate, James Bourn, who stated that he had recently been homeless, that he lived with Zearley for almost a month, and that he had only a few belongings with him.  Bourn stated that the items in the residence, including the electronics seized, were Zearley's.  Bourn also stated that he saw Zearley communicating with minors on one of the SUBJECT DEVICES, namely the Samsung tablet, and that Zearley posed as a minor while doing so.  Bourne stated that he and Zearley befriended a woman whom they met at a local convenient store and that she had children who came to Zearley's house.

22.     Also located in the basement was a large plastic container with a ski mask, rubber gloves, condoms, pepper spray, bleach wipes, a pellet gun with pellets, tampons, candy, an extension cord, heavy duty tape, gauze, baby wipes, dish liquid, a flashlight, spray potpourri, and an electric shock device.  Additionally, in the same room were a soiled children's diaper and children's clothes.

23.      The USPO found square, clear chewing gums, which the Louisa County Sheriff's Office seized and examined.  Those square gums contained cannabidiol (CBD).  Based on my training and experience, I know that CBD may be used to sedate victims, such as children.

24.     A large spotlight was also found in the basement.  Based on my training and experience, I know that such spotlights may be used when recording video, such as child pornography.

25.     The SUBJECT DEVICES were forwarded to the USPO laboratory for examination.  The USPO conducted an  examination of the SUBJECT DEVICES, except the thumb drives.

26.     The USPO was unable to examine the contents of all but the laptop due to issues relating to encryption, password protection, or factory resets.  Due to these factors, all the digital items were transferred to CEOS in Washington, D.C. for further examination.

27.     On his laptop, the USPO found sexual stories about minors, potential child exploitation images, and child pornography, as defined in 18 U.S.C. § 2256.  Zearley also visited kidschat.net, adultchat.net and limewire.com as well as searched for chat rooms through www.bing.com.  The Edge/Internet Explorer 10-11 main history section revealed activities on this device labeled (typed as seen in the extraction): Hi I Conner I gay and a boylover too.docx, ILLICIT CORPORATL PUNISHMENT (child smacking or spanking)_ video clips_ Iran.html, My name is Hannibal Smith.docx, partnership.docx, Adopted from Russia at age 6 years old.docx, as well as different images containing the words Lolicon-Shotacon and Yaoi-Shotacon. I know based on my training and experience that Lolita and Loli are terms used in searching for child pornography.

28.     On his laptop, the USPO saw that Zearley refers to himself as Hannibal Smith, founder of "Pedophile Associates of America."

29.      The Google and Parsed Search Queries on his laptop revealed numerous searches of concern, including (typed as seen in the extraction): 10 inch realistic ejaculating dildo (Searched date April 19, 2019), 10" inch long 3 prong speculums (Searched date April 19, 2019), 10" inch long anal opener plugs (Searched date April 19, 2019), 55 galons of aanl lube (Searched

date April 19, 2019), 6 year old Russian boys (Searched date June 8, 2019), adult chat (Searched date June 9, 2019), boy behind prison bars (Searched date June 9, 2019), boy bent over bed getting spanking crying (Searched date June 9, 2019), boy caned in movies and tv shows (Searched date June 9, 2019), boy spankings apps (Searched date June 9, 2019), boy getting large volume enema naked (Searched date June 9, 2019), hard core child porn pics (Searched date June 9, 2019), hydration IV kits (Searched date April 19, 2019), images of little boys getting raped up their butts (Searched date June 8, 2019), kid chat (Searched date June 8, 2019), kid spanking (Searched date June 9, 2019), limewire (Searched date June 9, 2019), little boy at doctor's office (Searched date June 8, 2019), little boy bent over spanked (Searched date June 9, 2019), missing boys posters (Searched date June 9, 2019), needless spanking man boy Movie (Searched date June 9, 2019), pictures of boys during sexual molestation (Searched date June 8, 2019), real hard core child porn pics (Searched date June 9, 2019), rectal speculums (Searched date June 8, 2019), runaway boy wanted posters (Searched date June 9, 2019), spanking School canes (Searched date June 8, 2019), torchild porn pics sites.

30.     Based on my training and experience, I know  that those on supervision avoid detection by obtaining unauthorized electronic devices and accessing child pornography on those unauthorized and unmonitored devices.

31.     The SUBJECT DEVICES came into CEOS' possession through the following manner: the USPO transferred the devices to the undersigned affiant, and the undersigned affiant mailed the devices to CEOS.[1]

## **TECHNICAL TERMS**

32.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

---

[1] After CEOS received the SUBJECT DEVICES in the mail, they were logged into evidence by the director of CEOS HTIU, who logged the evidence because of the present restrictions on access to the CEOS office to help curb the spread of COVID 19.  Unaware that the United States was seeking this warrant (in an abundance of caution), the director viewed some of the data on some of the items.  He did not perform a full forensic analysis and none of his observations are included in this affidavit nor relied upon to establish probable cause.

2)    "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.    "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities.

12

These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

       c.    A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

       d.    A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives

signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.   Data security devices may consist of hardware, software, or other programming code.   A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.   Data security hardware may include encryption devices, chips, and circuit boards.   Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.   Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.   Computer software is stored in electronic, magnetic, or other digital form.   It commonly includes programs to run operating systems, applications, and utilities.

g.     Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.   An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).   Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.   Most Internet service providers control a range of IP addresses.   Some computers have static—that is,

long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

        h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

        i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

        j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.      "Peer to Peer file sharing" (P2P), including, but not limited to LimeWire [any others we know he used??]  is a method of communication available to Internet users

16

through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

      i.     When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

      ii.     Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

      o.     "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections,

17

encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

        p.     "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

        q.     "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

        33.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the SUBJECT DEVICES, in whatever form they are found.  Based on my knowledge,

training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the SUBJECT DEVICES for at least the following reasons:

       a.     Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the collection of child pornography (hereafter "collectors").

       b.    Collectors may receive sexual stimulation and satisfaction from contact with children, or from having fantasies of children engaged in sexual activity or suggestive poses, or from literature describing such activity.

       c.    Collectors may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Collectors typically use these materials for their own sexual arousal and gratification.  Collectors often have companion collections of child erotica.  Child erotica are materials or items that are sexually suggestive and arousing to pedophiles, but which are not in and of themselves obscene or pornographic.  Such items may include photographs of clothed children, drawings, sketches, fantasy writings, diaries, pedophilic literature and sexual aids.

       d.    Collectors who also actively seek to engage in sexual activity with children may use these materials to lower the inhibitions of a child they are attempting to seduce,

convince the child of the normalcy of such conduct, sexually arouse their selected child partner, or demonstrate how to perform the desired sexual acts.

e.    Collectors almost always possess and maintain their "hard copies" of child pornographic images and reference materials (*e.g.,* mailing and address lists) in a private and secure location.  With the growth of the Internet and computers, a large percentage of most collections today are in digital format.  Typically these materials are kept at the collector's residence for easy access and viewing.  Collectors usually place high value on their materials because of the difficulty, and legal and social danger, associated with acquiring them.  As a result, it is not uncommon for collectors to retain child pornography for long periods of time, even for years.  Collectors often discard child pornography images only while "culling" their collections to improve their overall quality.

f.    Collectors also may correspond with and/or meet others to share information and materials.   They may save correspondence from other child pornography distributors/collectors, including contact information like email addresses, and may conceal such correspondence as they do their sexually explicit material.

g.    Collectors prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h.    Subscribers to websites that are primarily designed to provide child pornography have a strong likelihood of being collectors of child pornography.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.   It has also revolutionized the way in which child pornography

collectors interact with each other, as well the methods that individuals will use to interact with and sexually exploit children. Computers serve four functions in connection with child pornography: production; communication; distribution and storage.

i. **Production**. Pornographers can now produce both still and moving images directly from a common video camera. The camera is attached, using a cable, directly to the computer using a device called a video capture board. This device turns the video output into a form that is usable by computer programs. The output of the video camera can be stored, manipulated, transferred or printed directly from the computer. The captured image can be edited (i.e., lightened, darkened, cropped, digitally enhanced, etc.) with a variety of commonly available graphics programs. The producers of child pornography can also use scanners to convert hard-copy photographs into digital images.

j. **Communication**. Previously, child pornography collectors had to rely on personal contact, U.S. mail, and telephonic communications in order to sell, trade, or market pornography. Today most communications associated with the trafficking of child pornography occur via the obscurity and relative anonymity of the Internet. A device known as a modem allows any computer to connect to the Internet via telephone lines or broadband Internet connections. Once connected to the Internet, individuals search for and/or offer to distribute child pornography in a wide variety of ways. Many individuals congregate in topic-based Internet chat rooms implicitly or explicitly dedicated to child pornography. Online discussions in these chat rooms are usually done via instant message (or "IM"), and individuals may then establish one-on-one chat sessions involving private messages (or "PMs"), visible only to the two parties, to trade child pornography. These child pornography images may attachments to the

21

PMs, or they may be sent separately via electronic mail between the two parties. Pedophile websites communicate advertisements for the sale of child pornography, and individuals may order child pornography from these websites using email or send order information from their web browser (using HTTP computer language). Some individuals communicate via Internet Relay Chat (IRC) to discuss and trade child pornography images. It is not uncommon for child pornography collectors to engage in mutual validation of their interest in such material through Internet-based communications.

        k.   **Distribution**. Computers and the Internet are the preferred method to distribute child pornography. As discussed above, such images may be distributed via electronic mail (either as an attachment or embedded image), or through instant messages as attachments. Child pornography is regularly downloaded from servers or Usenet newsgroups via a method known as FTP (file transfer protocol). Child pornography images are also distributed from websites via client computers web browsers downloading such images via HTTP (Hyper Text Transfer Protocol).

        l.   **Storage.** The computer's capability to store images in digital form makes it an ideal repository for pornography. A single floppy disk can store dozens of images and hundreds of pages of text. The size of computer hard drives used in home computers has grown tremendously within the last several years. Hard drives with the capacity of two hundred (200) gigabytes are not uncommon. These drives can store thousands of images at very high resolution. Remote storage of these images on servers physically removed from a collector's home computer adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that

image to storage in another country.  Once this is done, there is no readily apparent evidence at the scene of the crime.  Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

       m.  Computers store data, both on removable media (for example, DVDs and Thumb Drives) and internal media, in ways that are not completely known or controlled by most users.  Once stored, data is usually not destroyed until it is overwritten.  For example, data that is "deleted" by a user is usually not actually deleted until it is overwritten by machine processes (rather than user decision) that decide where to store data and when overwriting will occur.  Therefore, files and fragments of files and other data may easily last months, if not years, if the storage media is retained.

       n.  Typically, computer forensics focuses on at least three categories of data. These are:  1) active data – such as current files on the computer, still visible in file directories and available to the software applications loaded on the computer; 2) latent data – such as deleted files and other data that resides on a computer's hard drive and other electronic media in areas available for data storage, but which are usually inaccessible without the use of specialized forensic tools and techniques; and 3) archival data –  such as data which has been transferred or backed up to other media such as CDs, floppy disks, tapes, and ZIP disks.

       o.  Active data includes not only files created by and with the user's knowledge, but also may include items such as Internet history log files, system registry files (listing all the systems and software applications installed on a computer, including the dates of installation, use, and deletion), and date/time file stamps automatically created that identify when files were created, modified, and last accessed.

p.    Latent data includes data retained and stored on computer media in "unallocated" and "slack" space.   Unallocated space refers to space on a hard drive that is available for the storage of new data.  Slack space refers to any leftover space that remains when an active file is stored in particular location on the hard drive that is akin to an empty shelf in a closet containing other full shelves.   Deleted files and other latent data that has not been overwritten by new data or files often may be accessed by a qualified forensic examiner from the unallocated and slack space on a computer user's hard drive months and years after such data was created by the user or the computer's operating system.

q.    I know, based upon my training and experience, that a qualified forensic examiner may use knowledge of the mechanisms used to store electronic data to unlock and to uncover the activities of a computer's user years after the fact by examination of active, latent, and archival data. Through the use of proper computer forensic techniques such data and evidence of criminal offenses may be recovered, notwithstanding the passage of time since a crime occurred.

r.    Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

s.    Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years

later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

34.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination

of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

      a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point

toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is

not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

      f.      I know that when an individual uses a digital device to store or trade child pornography, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

### METHODS TO BE USED TO SEARCH DIGITAL DEVICES

35.      Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

      a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form

of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

29

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.     Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.     Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and

31

user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

36.     In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

a.     The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

b.     The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden or encrypted files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

c.   In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.   Any search techniques or protocols used in searching the contents of the Device(s) will be specifically chosen to identify the specific items to be seized under this warrant.

**AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

33.       Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night, and to have HTIU analysts keep and maintain the SUBJECT DEVICES.

## **CONCLUSION**

35.     I submit that this affidavit supports probable cause for a warrant to search the

SUBJECT DEVICES described in Attachment A and to seize the items described in Attachment

B.

_____
Special Agent Philipp W. Alhusen
Federal Bureau of Investigation

SUBSCRIBED and SWORN
before me this _____ of June 2020

_____
UNITED STATES MAGISTRATE JUDGE

34

## ATTACHMENT A

## DESCRIPTION OF ELECTRONIC ITEMS TO BE SEARCHED

The property to be searched is (SUBJECT DEVICES):

1. One black HP laptop, Model # 17-bs049dx, SN 8CG80347OS;

2. One Samsung Verizon Tablet, Model # SM-T387V, IMEI 355420101760479;

3. One black Samsung Galaxy J7 Verizon cell phone, Model # SM-J727V, IMEI 359500095684714;

4. One black/gray LG AT&T cell phone;

5. One black ZTE cell phone with cracked screen and missing back cover;

6. One black and red Kyocera DuraXV Verizon cell phone;

7. Thumb drive/ red/silver/ Clatterbuck Home Inspections, LLC 571-337-2745;

8. Thumb drive/ Lexar 16G/ White/Purple Top/ LJD 550-16GB-000-113;

9. Thumb drive/ blue/silver/ Regional Plan Association/ 1 GB;

10. Thumb drive/ Lexar/ white/ 16GB/ grey top/ LJD 550-16GB-000-109.

The property is currently located at 1400 New York Ave. NW, Ste. 600, Washington, DC 20543. This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

## LIST OF ITEMS TO BE SEARCHED

1.      All records on the Device described in Attachment A that relate to violations of

Title 18, United States Code, Sections 2422, 2252, and 2252A (Enticement of a

Minor, and Possession, Distribution, Receipt, and Access with Intent to View

Child Pornography ), and the aiding and abetting of these crimes:

a)      Child pornography;

b)      Child erotica and evidence of access to children;

c)      Information, correspondence, records, documents or other materials constituting

evidence of or pertaining to child pornography, child erotica, or access to children; or

constituting evidence of or pertaining to the production, possession, receipt, distribution,

accessing, or transmission through interstate or foreign commerce of child pornography,

child erotica, or visual depictions of minors engaged in sexually explicit conduct; or

constituting evidence of or pertaining to an interest in child pornography or sexual

activity with children;

d)      Records or documents evidencing occupancy or ownership of the SUBJECT

DEVICE, including utility and telephone bills, email or addressed correspondence; and

2)      For the computer or storage medium whose seizure is otherwise authorized by this

warrant (hereinafter, "DEVICE"):

36

(a)      evidence of who used, owned, or controlled the DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

(b)      evidence of software that would allow others to control the DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

(c)      evidence of the lack of such malicious software;

(d)      evidence of the attachment to the DEVICE of other storage devices or similar containers for electronic evidence;

(e)      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the DEVICE;

(f)      evidence of the times the DEVICE was used;

(g)      records of or information about Internet Protocol addresses used by the DEVICE;

(h)      records of or information about the DEVICE's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

37

(i)      contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.